IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND



Jerome Segal
7910 Takoma Ave
Silver Spring, Md. 20910

Peter Roemer
616 Great Falls Road
Rockville, Md. 20850

Michael Hodge
227 Cypress Creek Rd.
Severna Park, Md. 21146

    Plaintiffs                 :        Civil Action No:

v.                                     GJH 18 CV2731

Maryland State Board of Elections
Linda Lamone, State Administrator
151 West St, Suite 200
Annapolis, Md. 21401

    Defendant

## Introduction

**This complaint is filed Pro Se.**

### Relief Sought:

The plaintiffs, Dr. Jerome Segal, Dr. Peter Roemer, and Michael Hodge request of the Court a preliminary injunction ordering the Maryland State Board of Elections to a) re-evaluate the August 6th new-party petition of The Bread and Roses Party, using the "sufficient cumulative information" criteria, and if 10,000 valid signatures are identified, to then place the name of Jerome Segal on the ballot for the November 2018 election for US Senator, as the nominee of The Bread and Roses Party, or alternatively b) if the Board cannot in a timely fashion re-examine the signatures in the August 6th petition, then it should, without further re-examination, place the name of Jerome Segal on the ballot.

### Urgency:

The State Board of Elections (SBE) is responsible for preparing the ballot for the November elections. According to the SBE's published schedule, key dates in the process are identified in the September 12 – Sept 17, 2018 period. The initial preparation of the ballot deadline is Sept. 12th; display is Sept. 13th; deadline for seeking judicial review is Sept 14th, and Sept. 17th is identified as the date when the Board may begin printing the ballots.

### Summary of the Pleading:

**The plaintiffs will address the four questions the Court uses in determining whether to grant a preliminary injunction:**

1) Has the petitioner shown that without such relief it will suffer irreparable injury?
2) Would the issuance of the injunction substantially harm other interested parties?
3) Wherein lies the public interest?
4) Does the petitioner have substantial likelihood of success on the merits?

Because this case involves the election for U.S. Senator from Maryland, considerable attention will be paid to the public interest dimension.

Our case challenges the actions of the SBE as a violation of the U.S. Constitution. We will show a likelihood to **prevail in the face of two laws of the State of Maryland, both of which have been invoked by the Board of Elections to reject Dr. Segal's candidacy. The first is a provision of the Election Law pertaining to the validation of signatures on Bread and Roses petition to qualify as a political party with the right to place its nominees on the November ballot. The second is a law that prevents the Board from placing Segal on the ballot because he ran, unsuccessfully, in the Democratic Party Primary for US Senator in the June 2018 elections.**

1

In our pleading, we will show a sufficiently strong case of the unconstitutionality of both of these statutes in their application to Dr. Segal's candidacy to meet the "likeliness to prevail" standard.

# Complaint

### 1. <u>The Plaintiffs:</u>

2. Dr. Segal is a political philosopher and social activist. He is the founder of The Jewish Peace Lobby (1989) and was a candidate in the 2018 Democratic Primary. He is the State Chairman of The Bread and Roses Party, and a Maryland Resident.

3. Dr. Peter Roemer is a Maryland resident, a voter, and one of the 25 members of the Bread and Roses interim governing body.

4. Michael Hodge is an independent voter with no prior relationship to Dr. Segal, and no relationship to the Bread and Roses Party. He too is a Maryland resident.

### 5. <u>Chronology:</u>

6. On June 26th Dr. Jerome Segal ran as a candidate in the Democratic Primary to determine who would be the U.S. Senate nominee of the Democratic Party in the General Election in November 2018. The primary contest was won by Senator Ben Cardin.

7. On July 2nd Dr. Segal met with Jared DeMarinis, Director of the Candidacy and Campaign Division of the SBE, and discussed his interest in running as a candidate of another party in the General Election. Mr. DeMarinis explained that the Board could not put him on the ballot because of Maryland law and that his only option was to go to court and raise questions of Constitutionality. Subsequently, that day, Segal filed papers changing his registration from Democrat to unaffiliated, and following Mr. DeMarinis' explanation of required steps needed to be taken prior to going to court Segal filed declaration of intent to seek candidacy forms, which Mr. DeMarinis   directed his staff to date stamp and then to also stamp "Rejected." Copies were made for SBE files and the original returned to Segal. One of these left blank the party affiliation in anticipation that Segal might be successful in obtaining the necessary 10,000 signatures on a petition to establish the Bread and Roses Party, by the Aug 6th deadline for a new party to nominate candidates to put on the ballot, as explained by Mr. DeMarinis.

8. On August 6th Segal returned to the Board of Elections with over 15,000 signatures calling for the Bread and Roses party to be recognized by the State, and identifying Dr. Segal as State Chairman. It was accompanied, as required, by a list of 25 individuals who constitute the interim governing body of the new party. These were filed and a receipt given to Segal. Segal then submitted a new declaration of intent form showing an affiliation with the Bread and Roses Party, and a designation of candidate statement from the Bread and Roses party naming him as their candidate in the General election in November. These in turn were date stamped by the Board of Elections, then stamped "rejected" and returned to Segal.

9. On August 27th, Segal received from Donna Duncan, the Assistant Director for Election Policy of the SBE, an email informing him that the Board of Elections had completed the validation process and found that the Bread and Roses petition contained only 9,773 valid signatures, falling 227 short of the required 10,000. Ms. Duncan also provided an attachment showing that over 1,200 of the signatures were invalidated because they had failed to satisfy "the name standard," a provision of Maryland law requiring that petition signers sign their name "as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other name." (Exhibit A)

10. On August 29th Segal received from Mr. DeMarinis an email stating:

    i. "Your candidacy as the Bread and Rose U.S. Senate candidate for the General Election was rejected. Pursuant to Election Law Article 5-706, a candidate defeated in the Primary Election may not appear on the ballot at the next succeeding general election. Additionally, the political party failed to qualify for the 2018 General Election." (Exhibit B)

11. On September 4th Segal received an e-mail from Janet Smith, Voter Registration Manager of Audits, State Board of Elections, stating that in a random sample of 50 of the over 1,200 signatures invalidated because of the name standard, the majority were invalidated because of the absence of a middle initial:

    "I have finished the promised review of 50 "name standard" rejections. Donna will have the envelope for you if you stop by while I am out of the office. The majority are rejected for a missing middle name." (Exhibit C).

## 12.    Standard for Preliminary Injunction

3

a. A fourfold test for adjudicating petitions for interlocutory relief was set forth in Airport Comm. of Forsyth Co., N.C. v. CAB, 296 F.2d 95 (4th Cir. 1961):

    i. Has the petitioner made a strong showing that it is likely to prevail upon the merits?

    ii. Has the petitioner shown that without such relief it will suffer irreparable injury?

    iii. Would the issuance of the injunction substantially harm other interested parties?
    iv. Wherein lies the public interest?

b. We approach these in a different order:

## 13.    First Issue: Probable irreparable injury to the plaintiffs without a decree:

14. **Harms will be irreparable:** Because the State must quickly begin printing ballots for the November election, only through a preliminary injunction will Dr. Segal's name appear on the November ballot. There will not be another route. What then are these harms?

### Harm to Plaintiff #1: Dr. Segal

### a. Financial Harm:

15. We stipulate that Dr. Segal's candidacy is not motivated by financial considerations. Rather, he is essentially an old-fashioned idealist, both as a philosopher and as a life-long political change agent. That said, there is no doctrine in law that is a basis for the court not giving equal weight to the financial interests of an idealist as opposed to those of the most avaricious among us, or those of an average citizen involved in commercial transactions.

> **Harm to Dr. Segal's potential future income.** The electoral contest in November is essentially an employment decision. The candidates are all seeking the job of U.S. Senator, with a contract of six years and paying $174,000 per year, and totaling $1,044,000. If on the ballot in November, Dr. Segal will be one of the four finalists seeking this high paying job. If not on the ballot, he will be removed from any effective competition. Dr. Segal's earned income in 2017 was $16,000, and may be less in 2018. The disparity between what he could earn if elected Senator and what he would otherwise earn is well over $150,000 a year, and over $900,000 for

the life of the job contract. The harm to his potential future income by preventing ballot access is substantial.

**Harm to Dr. Segal's ability to regain funds owed to him by Segal For Senate.** In the course of the Senate Primary campaign, Dr. Segal loaned to the campaign fund, Segal For Senate, over $1.4 million of his own funds. If Segal does not appear on the ballot for the November election, Segal For Senate is a defunct organization, with no opportunity to raise money and no opportunity to repay its financial debt to Dr. Segal.

## 16. b) Non-financial harm to Dr. Segal:

17. The non-financial injury that Dr. Segal will suffer can best be seen in the context of Dr. Segal's life-long carrier and activities.

18. For several decades Dr. Segal both in his work for Israeli-Palestinian peace and in his book *Graceful Simplicity: The Philosophy and Politics of The Alternative American Dream*, has been developing policy proposals directed at peace in the middle east and at a more just and fulfilling society at home. His entry into electoral politics comes not from a personal quest to exercise political power through elective office, but rather through a realization that electoral contests are the great free-speech arena of American life.

19. The failure to win injunctive relief to place him on the ballot will severely burden his right to free speech, not in the sense that he cannot stand on a soap box in "Hyde Park" and say what he wishes, but that he cannot speak within the singular arena in American life in which people listen to what one has to say, an arena in which one can reach very large audiences, and in which one can test one's ideas against one's opponents and potentially win the public to one's point of view.

20. The November election contest, and in particular the expected debate between the rival candidates represents a unique free speech opportunity which would be the crystallization of Dr. Segal's life project. To be deprived on this opportunity is no small loss. To be so deprived because of State statutes that serve (as we shall argue) no significant social purpose, is no small injustice.

## 21. Harm to Plaintiff #2: Dr. Peter Roemer

22. Mr. Roemer has joined this case in two capacities. First as a member of the 25-person interim governing body of the Bread and Roses Party; secondly as a voter who would like to vote for Dr. Segal in the November elections.

## 23. {a} Associational Injury

24. As a member of the interim governing body of Bread and Roses, Mr. Roemer has a freedom of association right which includes the right to band together with other like-minded persons to win public support for political and social perspectives. When pursuit of this project is hampered he suffers injury. When this injury is urgent and irreparable and when not balanced by potential injury to legitimate state purposes, he is entitled to injunctive relief.

25. Bread and Roses is a newly established electoral party. It is the inspiration of Dr. Segal, and at this very early stage in its organization, it is very heavily based on Dr. Segal's writings, and on the positions, momentum and name recognition that he took and attained in the course of his campaign in the Democratic Primary. The main modality for the expansion of Bread and Roses and the dissemination of its beliefs and values is that of electoral campaigns.

26. Because of the stage of organizational development and the unique role of Dr. Segal in the association, the project of the organization is uniquely dependent upon his ability to enter electoral campaigns. Moreover, because of the State determined time-table which set August 6th as the deadline for nominations by a new party, only Dr. Segal, of all potential candidates representing Bread and Roses, is presently entitled to be nominated by Bread and Roses for the 2018 elections. Thus, if injunctive relief putting Dr. Segal on the ballot this November is not forthcoming, at the very least, Bread and Roses will suffer a two-year delay in its organization efforts.

27. This, however, vastly understates the injury to the associational project of which Dr. Roemer is a part, as 2018 represents a unique organizational opportunity for Bread and Roses given that Dr. Segal would be running against Senator Cardin whose affiliations and positions on foreign policy issues represent a diametrical contrast with those of Dr. Segal, and of many Maryland voters. We see no-basis for believing that such an opportunity will arise in 2020 or at any point thereafter.

**28. {b} Voter rights injury.**

29. Dr. Roemer has a strong right and interest, vis a vis the November election for US Senator, in being able to cast his ballot for a candidate who best reflects his beliefs and values. Dr. Roemer views that potential candidate to be Dr. Segal. If injunctive relief is not provided, Mr. Roemer will suffer irreparable injury to his voter rights and thus incur irreparable harm.

30. In this, Dr. Roemer represents a large number of Maryland voters who wish to vote for Dr. Segal. It should be noted that in the primary, even in the absence of press coverage of his candidacy, over 20,000 Marylanders voted for Dr. Segal.

### 31. Harm to Plaintiff #3: Michael Hodge

32. Mr. Hodge has no connection to The Bread and Roses Party, and prior to his joining this pleading was unknown to Dr. Segal. In this case he is the symbolic representative of all Maryland voters who have not made up their minds as to who to vote for in November, and have a strong interest in being an informed voter, one knowledgeable about fundamental questions that may be at stake in the election and which may be affected by his or her vote, and an interest in knowingly voting for a candidate who best represents his or her beliefs and values.

33. If injunctive relief is not provided that places Dr. Segal on the ballot, fundamental issues that are only raised by his candidacy will not be explored in the election contest. These include:

34. What should be the version of the American Dream supported by our public policies?

35. Should schools be vehicles for making students more competitive against each other in a failing job system, or should they return to fundamental tasks such as teaching history and the humanities?

36. How should the United Nations Security Council be best utilized to promote an end to the Israeli-Palestinian conflict?

37. Accordingly, without Dr. Segal's candidacy Mr. Hodge and other voters will not be given an opportunity to weigh in on such issues, even though such issues will implicitly be determined by those they elect. This harm to Mr. Hodge applies to all Maryland voters, and will be explored in greater depth in the public interest section below.

## 38.   Second Issue: Absence of harm to legitimate interests represented by the State if injunctive relief is given.

39. The only consequence of providing injunctive relief to the plaintiff is that Dr. Segal's name will appear on the ballot. We will argue below that there is a substantial public interest in this happening. The state will argue that there are multiple state interests that have been recognized by the courts as factors that can be invoked to justify the burden on rights of candidates, parties and voters, in setting ballot access regulations. These include maintaining the integrity of the petition process, preventing the splintering of parties, preventing the importation of intra-party feuds into the General Election, and preventing voter confusion.

40. We do not contest that such interests, properly understood, may be worthy of protection, nor do we contest that state statutes narrowly tailored to promote such state interests are Constitutional. **The issue before the court, however, is not these abstractions. It is whether in this case, placing Dr. Segal's name on the ballot produces any likelihood of harm to those interests, and if so, how great a likelihood and how great a harm.**

41. Some of this will be discussed subsequently in explaining why plaintiffs are likely to prevail when the claim is fully adjudicated. Here we address the two interests most closely related to this case:

42. The State's interest in being able to ascertain the identity and voter registration status of petition signers;

43. The State's interest in preventing "splintering" of political parties and in preventing the importation of intra-party feuds into the General Election.

44. These have special relevance because they bear on the two statutes invoked in Mr. DeMarinis' email letter to Dr. Segal explaining why the Board has refused to place his name on the ballot.

45. First, we note that because this is a petition for injunctive relief, any decision by the court in favor of the Plaintiffs **will not in itself resolve the issue of Constitutionality** which would require full adjudication on the merits. Thus, the provision of injunctive relief does not threaten any general practice engaged in by the State. **The assessment of harm from the injunction only goes to the harm of allowing Dr. Segal's name on the ballot this November.** On its face, this does not threaten broad state interests such a maintaining political stability.

46. With respect to the State interest in ascertaining voter identity, this is not threatened by injunctive relief because we are seeking only that the state be directed to use the standard of "sufficient cumulative evidence" when examining those who have signed the petition, and further, **because it has already been established in court that the state, even among those failing to meet the name standard of the statute, is sufficiently confident of the validity of the signatures, that it uses address information from these petitions signees to update the voter registration rolls:**

        i. "11.   **Appellant conceded that it engages in the practice of using information contained in petition entries for the purpose of updating voter registration records even when it finds the information insufficient for the purpose of validating the entries under § 6–203(a); Appellant's most recent guidelines, included in the record of this case, provide further evidence of**

**that practice."** (Court of Appeals, Maryland Green Party v. Maryland Board of Elections)

47. With respect to preventing the importation of intra-party feuds, this is irrelevant to the present case because no such intra-party feud exists. Dr. Segal is a complete new-comer to Democratic Party politics. His disagreement with the Democratic candidate is over matters of substantial public interest, just the kind of issues that the courts have held should be addressed in General Elections as distinct from intra-party feuds which should be left to the primary elections. (South Carolina Green Party v. South Carolina Board of Elections, US Court of Appeals, 4th Circuit).

48. As to party splintering, the courts have maintained that there is no legitimate state interest in protecting the Democratic or Republican party from losing votes in a General Election because voters prefer candidates from Third Parties.

49. More generally with respect to "splintering," the term has not been sharply defined, but is best understood in connection with the continuation of intra-party feuds. Thus, in splintering, because of a feud, a party may be broken up into sub-groups **who do not differ because of fundamental differences in values and core policy,** but rather because of allegiances to different parties to a feud, and thus the party integrity that would have been maintained is sacrificed if losers in a primary are allowed to carry the feud forward but running as nominees of other parties. Patently, this is not what is involved in the present case. If Democratic Party voters decide to vote for Dr. Segal in the General Election, it will not be because he has splintered the Party, taken his faction with him, but because on fundamental issues of public policy, those voters, each in their individual evaluation of issues and candidates, share his views or otherwise see him as their preferred choice.

50. The State has no interest in seeking to prevent such choice by the voters. Indeed, when the State prevents voters from so acting, the general legitimacy of elections is thrown into question, and thus the legitimacy of the State itself.

51. **Issue 3: How Will the Public Interest be Affected by Granting Plaintiff's motion to place Dr. Segal's name on the ballot.**

52. Here we cite a multitude of public interests that will indeed be furthered by placing Dr. Segal's name on the ballot, and which will be sacrificed if he is not placed on the ballot. Again, this is not an abstract claim, say, of "more choices" or "more expression." Rather, it is a matter of the actual public interest to be served, here and now, by this particular step. Thus, it cannot be properly

9

presented or evaluated without some information about Dr. Segal, his candidacy, and the role and perspective of the Bread and Roses Party.

53. On Dr. Segal:

- Segal in a 74-year-old philosopher/policy analyst. The Democratic Senate Primary was his first entry into electoral politics. He had no prior involvement in the Democratic Party politics, though a registered Democrat for decades. He does not know Senator Cardin, and is not involved in any intra-Party feud whatsoever.

- Segal for 29 years has been President of The Jewish Peace Lobby, an alternative voice from that of AIPAC, the dominant lobbying organization to emerge from the American-Jewish Community on matters relating to Israel.

- Segal is the author of *Graceful Simplicity: The Philosophy and Politics of the Alternative American Dream.* Both with respect to his work on the Israeli-Palestinian conflict and on socio-economic issues and policy, he is viewed as a highly original thinker. He has co-authored work with a Nobel prize winner and a former Foreign Minister of Israel.

- Segal is an "old fashioned idealist," – In the period leading up to the establishment of the Jewish Peace Lobby, he led the first Jewish-American delegation to go to Tunis to open dialogue with the PLO; he played a key role in getting the PLO to accept the 1947 United Nations Partition Resolution; he served as a back channel between the PLO and the US State Department. Following that, he resigned his GS-15 position in USAID which today pays $136,659/year, and started The Jewish Peace Lobby. As the director of JPL, he has never received more than $24,000 a year.

54. On the nature of his candidacy:

There have been and continue to be, two broad policy areas that Dr. Segal seeks to put before the public in the General Election:

1. Dr. Segal has campaigned against Senator Cardin because of Cardin's foreign policy role. Segal maintains that Cardin helps develop and promote AIPAC's

approach to US middle east policy. This includes Cardin's vote against the Iran nuclear deal; Cardin's anti-BDS legislation, Cardin's leadership in opposing a role for the UN Security Council in promoting an end to the Israeli-Palestinian conflict.

55. Segal's candidacy is the first time in American political history that anyone has challenged a sitting US Senator because of his fealty to AIPAC. Dr. Segal's political project is directed at "cutting AIPAC down to size" through his campaign against Cardin. To succeed in this, he does not have to defeat Cardin, merely show that significant voters will vote against members of Congress because they follow, without serious thought, AIPAC's lead. His perceived role is to show that there is some risk, and some possible cost, associated with blind support of AIPAC positions. He argues that AIPAC dominates Congress just as does the NRA on gun issues, and that his campaign is a vehicle for voters to vote for liberating Congress. As this goes to factors that will influence whether or not we go to war against Iran, the public interest is by definition engaged.

56. 2. On **domestic affairs**, Dr. Segal argues for *A New American Dream*. The term "Roses" in his platform and in the name of his new political party represents: Beauty, Meaningful Work, and Sufficient Leisure to do "the things that matter most in life." He identifies with the writings of the early Karl Marx, describes himself as a socialist, and his party as "socialistic" in its ideals, yet experimental and pragmatic with respect to policy. His policy agenda on his website runs 24 pages, and his website contains dozens of his articles, including a free download of his book, *Graceful Simplicity,* which situates the quest for a life of "Plain living/High Thinking" within the public policy context rather than the "self-help" context.

57. **There are no campaigns in recent American political history that have been more ideas-based, and have more deeply challenged conventional thinking than Dr. Segal's campaign.**

58. **Political Context** – multiple elements of the current context in American politics are relevant to understanding the **Public Interest** involved in arguing the case for an injunction requiring that Segal appear on the ballot in November. The causal connection between Segal's candidacy and these interests will be argued for subsequently. Some of the interest involved are:

- Reorienting all social and economic policy towards making America "user friendly" towards those with an Alternative American Dream.

- Introducing the "need for beauty" into political discourse.

- Enriching the "What is Socialism?" question that has engaged many voters as a result of the 2016 Sanders campaign.

- Avoiding a war with Iran.

- Re-thinking US policy towards Hamas, the Palestinians and the Islamic world more generally, as a way of averting a war of civilizations.

- Returning the United States towards the post WWII and post Holocaust project of building strong international structures for promoting peace and justice through the United Nations.

- Vastly expanding home-ownership among the poorest groups in American Society through "extension service" programs to assist the most marginalized among us to navigate the challenges of home ownership.

- Reducing gun deaths by providing two-months of free summer camp to all children in the 10 most dangerous cities in America.

### 59. The Unmet Interest of Maryland Voters in the Issues and Perspectives Uniquely Raised by Dr. Segal:

60. Recent polling of a segment of Maryland voters provided relevant information about their interest in major transformations, and the sorts of issues that Dr. Segal would bring to the campaign, and which would not be part of the public discourse around the November electoral contest if he is kept off the ballot. Thus:

   a. On a scale of 1-5, with 5 being the highest, when asked how important it was to them that their Senator be "someone who challenges core aspects of American society, such as the distribution of wealth," 68% gave it a 4 or a 5.

   b. More generally when asked about "someone with really new ideas for American's future," 76 gave it a 4 or a 5. And 72% said it was time to "rethink what we should mean by the American Dream." And 74% said "their American Dream" was "to have enough income to live a relatively

modest, but decent and secure life, and then have lots of leisure to pursue the things in life that are most meaningful."

c. When asked to comment on the view (Segal's view) that focusing on schools to solve the problem of access to good jobs was harmful to students and turning schools "away from really important areas such as history, the humanities and the arts," 33% said they "totally agree" and another 47% said they "somewhat agree."

61. **Further, the polling showed that voters do not have information that they themselves view as critical to being able to vote in an informed manner.** Thus:

On Cardin's vote on the nuclear deal with Iran, only 11% knew that Cardin voted against it. 67% supported the deal, and when asked "if it turns out that Cardin voted against the deal" and did so because he supports Prime Minister Netanyahu desire for an American attack against Iran, 28% said they would "never vote for him" even if he was great on all other issues. (Exhibit D).

62. Only Dr. Segal in the primary campaign tried to inform the voters of the nature of Cardin's vote on the Iran deal, and because the media failed to cover Segal's challenge, and because Cardin refused to debate Segal, the public still is largely unaware of this critical vote. We believe that if Dr. Segal runs in the General Election, he will break through the media black-out, especially that of The Washington Post, which by refusing to cover the Senate race altogether, prevented Segal from contributing to the public good, by helping to educate voters.

63. As evidence that he is now beginning to gain access to the public and may well be able to successfully play a role in public education that he was not able to do in the primary, we cite, all in the first weeks of August:

64. An Associated Press story about Bread and Roses that has now been picked up by over 250 news outlets, mostly in Maryland.

65. An article about Segal and his effort to run in November which appears in the prestigious on-line publication: Maryland Matters.

66. A local TV interview on I-270 news that runs in Montgomery and Frederick counties.

67. A news story in a Hagerstown newspaper.

68. A recent interview by The Baltimore Sun for a story.

69. A local National Public Radio station devoted one half hour of air time for an in-depth interview with Dr. Segal.

70. We believe this public education role will only expand if he is on the ballot in November, and that the action by the State to block Segal's access to the ballot will be contrary to the public interest.

71. Further, in the primary, as noted above, the public interest in hearing candidates debate the great issues facing the Nation and the State, was not served because Senator Cardin refused to debate. It is a given that Cardin will debate his Republican opponent in the fall. If Dr. Segal is kept off the ballot, he will be excluded from any such debate. However, if he is on the ballot, given that he was denied a debate in the primary, it will be difficult for him to be denied participation in the General Election debate.

72. This is critical to all of the rights and public interest arguments previously cited. If the electoral disputation is the central free speech and public education arena in our democracy, candidate debates occupy the premier position as the place where free speech, free association and equal protection rights may be implemented, and where the public interest is served, and in which voter rights to be able to make an informed choice are respected.

## 73.    Issue 4:   The likelihood that the Plaintiffs will prevail if the case is fully heard by the Courts.

74. Though beyond the bar required for injunctive relief, we contend that the Plaintiffs have a very high likelihood of prevailing. Our argument to this effect involves the interplay of applicable law, the facts of the case, and the nature of the plaintiffs and the rights for which they claim protection.

### 75. Sketch of our argument:

In order to prevail on the Constitutional merits, we need to succeed in challenging two State of Maryland Statutes, the first is part of the Election Law. We challenge the constitutionality of provisions for validating signatures on petitions to establish new parties, specifically those dealing with a specified "name standard." The second being a statute preventing candidates who ran in a primary from appearing on the ballot in any respect. (a so called "sore loser" law). In the first instance, we are

14

challenging the Constitutionality of the Maryland statute on the grounds that it burdens Constitutional rights even when, according the state itself, such standard is not necessary for carrying forward legitimate state interests. In the second we argue that while the statute can be constitutionally applied to certain cases where it may be necessary to promote legitimate state interests, it cannot not be constitutionally applied to Dr. Segal as it unnecessary and disproportionately and severely burdens the Constitutional rights of the Plaintiffs. We accept that there may be other cases in which this is not the case.

76. Both statutes fall into the category of laws that limited ballot access. The Supreme Court has detailed appropriate court procedures for adjudicating such cases. Because it is recognized that the state must, as a necessity of there being a coherent electoral process, have rules that govern access to the ballot, cases must be decided through a balancing process. The basic entry point is whether any of the Plaintiffs Constitutionally protected rights are "severely burdened." If they are not then there it is generally the case that the States' regulatory procedures are affirmed by the courts without a "strict scrutiny" review. Alternatively, if a plaintiff's rights are severely burdened then the state has a variety of hurdles it must overcome to justify such burdening.

77. We believe we have a strong likelihood of prevailing on the merits because 1) we can meet the "severely burdened" threshold and thus trigger careful review of the specifics, and 2) when carefully reviewed in context, neither statute can meet the required showing of necessity.

78. Our reason for believing that we can reach the threshold for careful review ("strict scrutiny') in not just rooted in the specifics of the case, but also in the diversity of the Plaintiffs and of the rights involved. In particular, our case is based on **infringement of voter rights, which rights the Supreme Court has identified as its greatest concern in such cases and as a near-virtual trigger for a strict scrutiny review.**

79. If strict scrutiny is achieved, the Maryland statute on the name standard is doomed because the courts have already affirmed that it is not necessary to the key purpose of review of petition signatures. Indeed, it cannot even be sustained without strict scrutiny.

80. We also believe we will prevail against the second statute because while it can be justified in some cases, it was not narrowly tailored to avoid instances such as the circumstances of the Petitioners which fall outside the area where legitimate state purposes are involved.

81. Thus, the key to our prevailing overall is whether or not we can meet the standard for a strict scrutiny review: that one or more of one or more of the Plaintiffs Constitutionally protected rights are severely burdened.

82. Relevant Case Law:

In Maryland Board of Elections v. Maryland Libertarian Party, (Court of Appeals of Maryland 5/21/12) a strikingly similar situation emerged with respect to petitions submitted to the Board of Elections from both the Maryland Green Party and the Maryland Libertarian Party.  Both the Maryland Green Party and the Maryland Libertarian Party were told that they had failed to meet the 10,000-signature requirement. In explaining this failure, the Court of Appeals stated:

> Appellees cited several examples of instances where they claimed Appellant had erroneously invalidated petition signatures. Of particular relevance to the issues before this Court, Appellees claimed that Appellant erroneously invalidated petition entries "where a signature and a printed name both omitted an initial or an unused first or middle name[.]"

83. The history of the case, following the Board of Elections determination, was summarized in the Court of Appeals decision:

> a. "As a result, Appellees filed a Complaint in the Circuit Court for Anne Arundel County seeking a declaratory judgment that Appellant incorrectly applied the law regarding validation of petition signatures and that the applicable law was whether there was "sufficient cumulative information," a phrase appearing in Fire–Rescue, from which Appellant could identify a signatory on a petition as a registered voter. Appellees subsequently filed a Motion for Summary Judgment, along with a Stipulation of Facts Not in Dispute signed by counsel for all parties. Appellant then filed a Cross– Motion for Summary Judgment. **The trial judge granted Appellees' Motion for Summary Judgment**, reasoning that the overriding consideration for Appellant to use in validating a petition signature is **whether the identity of the signer can be verified. In his Order, the trial judge adopted Appellees' suggested "sufficient cumulative information" standard and declared that: the sufficient cumulative information standard forbids invalidating a petition entry merely because a signer omits an unused first or middle name;** the sufficient cumulative information standard **forbids invalidating a petition entry for name-related defects if, through other information contained in the entry, the signer's identity can be corroborated;** and no signature

16

should be considered a duplicate unless a signature from the same voter has been previously validated."

84. The Appeals Court reversed this decision maintaining that the Circuit Court had misunderstood previous Appeals Court rulings and that the "sufficient cumulative information" criteria applied only to situations of the illegibility of signatures, and that the Court had not introduced a standard that was an alternative to that detailed in section 603 (a) of **the statute whose provisions were mandatory**.

    a. "Of particular relevance to the issues in the instant case, on review in Doe, we interpreted the statutory requirements of § 6–203(a). The statute provides, in relevant part:

        In general.—To sign a petition, an individual shall:
        **sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; . . .**

    b. "We determined in our interpretation of § 6–203 that the words "shall" and "requirements" reflected **a mandatory directive that the signer must comply with all of the provisions of the statute**. Doe, 406 Md. at 728, 962 A.2d at 360. . . "

85. Having affirmed that the requirements of 6-203 (a) are mandatory and must each be satisfied, the court then addressed the question of the Constitutionality of the statute:

"Appellees also contend that this Court must interpret the relevant statutory provisions, as the trial judge did, so as to avoid any constitutional claims. They suggest that their interpretation of those provisions will avoid the "substantial constitutional issues that would arise under [Appellant's] competing construction." Discussing the importance of ballot access rights, Appellees emphasize that "[o]nce the authenticity of the [petition] signatures and the identity of the signers is admitted, any denial of voting rights based on the particular way a voter writes his name cannot survive even the most delicate judicial scrutiny.**" Appellees reiterate that they did not ask for the trial court to declare the statute at issue unconstitutional;** before this Court, they claim that, because the trial court adopted a construction of the statute that avoided constitutional issues, there was no need to request a declaration of unconstitutionality."

86. The Appeals Court however, rejected this argument:

"In his Order, the trial judge merely determined what he perceived to be the correct interpretation and application of our holding in Fire–Rescue, taking into account what he concluded was the "overriding consideration [of] whether the signer can be identified as the registered voter." **Accordingly, we decline to address constitutional claims that were not raised in, or decided by, the trial court."**

87. In explaining its unwillingness to rule on issues of Constitutionality, the court continued:

Furthermore, we are unsure, based upon Appellees' arguments before the trial court and before this Court, exactly what constitutional rights Appellees claim are being violated by Appellant's current guidelines for implementing the statute at issue. Appellees raise their constitutional arguments in a vague manner without expressly directing us to which provisions of the Federal Constitution or the Maryland Constitution have been violated, or will be violated if we accept Appellant's construction of the relevant statutory provisions. **This Court cannot be expected to supplement arguments of the parties that have not been addressed with sufficient specificity anywhere in the record.** See Klauenberg v. State, 355 Md. 528, 552, 735 A.2d 1061, 1074 (1999) (asserting that "arguments not presented in a brief or not presented with particularity will not be considered on appeal" (citation omitted)).

88. Thus, **the court explicitly pointed out that it was not ruling on any questions of the underlying constitutionality of the state statute because such issues had not been raised by the plaintiff in the original filing.**

89. **Applicability to this case:**

In this case, there are multiple plaintiff: a nominee seeking to be placed on the ballot; a member of the interim governing body of the new party, and an independent voter with no connection to the new party. Each Plaintiff bears Constitutionally protected rights. Their case, unlike Board of Elections v. Libertarian Party is based on Constitutional grounds, that freedoms of speech and assembly as well as voter rights are severely burdened by the imposition of an arbitrary, stand-alone requirement, with respect to middle initials and other elements of the "name-standard" as a necessary condition for new parties and third parties to be on the ballot, and thereby to develop a following and association among the voters, to raise issues of public concern and to elect officials who represent the views of voters.

90. Further in the present case failure to rule against the application of the statute will result in Bread and Roses not having any person on the ballot in November, and in Dr. Segal's not being able to appeal to voters on issues of national significance that otherwise will not be raised in the electoral contests, and in voters being denied the opportunity to be informed on key issues and being able to vote for candidates whose views they share.

91. The Plaintiffs arguement that application of the middle initial requirement serves no valid state purpose is supported by the following passage from the Appeals decision:

"11.  The primary issue before us is one of statutory interpretation. In their Brief, Appellees very briefly complain that, while rejecting as invalid the petition entries of signers who did not satisfy the requirements of § 6–203(a), Appellant found the cumulative information supplied by some of those signers sufficient to update their addresses in Appellant's voter registration records. **Appellant conceded that it engages in the practice of using information contained in petition entries for the purpose of updating voter registration records even when it finds the information insufficient for the purpose of validating the entries under § 6–203(a); Appellant's most recent guidelines, included in the record of this case, provide further evidence of that practice."**

92. The existence of this Board of Elections practice of using address information on unvalidated (rejected) signatures to update addresses of these registered voters, conclusively demonstrates that the criteria that form the basis for invalidation are not related to the key state purpose of establishing the identity of petitioners.

93. Thus, the Constitutional case against the middle initial requirement and other elements of "the name-standard" when they are not themselves needed to establish voter identity, is straight forward and compelling.

94. That being the case we focus on the key issue, the probability that we will prevail against the State of Maryland's so-called, "Sore Loser Law" which prohibits placing Dr. Segal on the ballot because he ran in the June Primary.

## 95.    The likelihood of a successful challenge to Maryland's so-called "sore loser" law:

96. There are two issues at play:

     i. Will the Plaintiffs succeed in showing "severe burdening" of Constitutionally protected rights and thus get a "strict scrutiny" review?

     ii. If they get a "strict scrutiny" review, will they prevail?

97. We will not address, at length, the latter issue as it will be resolved in the Plaintiffs favor as the State has failed to narrowly tailor its ballot restriction criteria so as to serve state purposes without severe burdening of rights. Only the contrary, the statute in question applies to any and all persons in all circumstances who have run in a primary. Indeed, it bars them from running for any office whatsoever. In enacting the law, the Maryland Legislature made no effort to distinguish contexts, to explore the degree to which State interests are genuinely threatened, nor to explore more fine-grained ways of protecting these interests. For instance, while sore loser laws have been justified as a means to avoid importing intra-party feuds into the General Election, the law allows for no distinction between situations where there is an intra-party feud and those where there is not.

98. If we were to have a full court inquiry into the absence of narrow tailoring, we would press this more fully, but see little issue as to whether the current statute is narrowly tailored. It clearly is not. Thus, the issue is whether or not Plaintiffs rights have been "severely burdened."

99. In arguing for the likelihood that the Plaintiffs will prevail on this issue, the case that needs to be carefully examined is South Carolina Green Party v. South Carolina Board of Elections, as decided July 20, 2010 by the U.S. Court of Appeals for the 4th Circuit.

100.     South Carolina enacted a sore loser law which is very similar to that of Maryland. It prohibits candidates who have run in a primary and lost, from appearing on the ballot in the general election. South Carolina Green Party challenged the Constitutionality of the statute as applied to the Green Party candidacy for Congress. The District court upheld the Constitutionality of the statute and this was affirmed by the Court of Appeals. Why then does this not establish guiding precedent for the current case?

101.     The key issue in the South Carolina case was whether the Green Party's rights of association were severely burdened by the application of the South Carolina statute. The Court concluded:

102.     "We conclude that the burden the sore-loser statute placed on the Green Party's associational rights is not severe."

103.    And,

104.    "our conclusion that the sore-loser statute imposed a modest rather than a severe, burden of the Green Party's associational rights. The burden imposed by the sore-loser statue was the Green Party's loss of its ability to field its preferred candidate. . ."

105.    Thus, the Court did not engage in the more stringent review it described: "Regulations that impose a **severe burden** on association rights are subject **to strict scrutiny**, and a court applying this level of review may uphold the regulation **only if** it is narrowly tailored and advance[s] a compelling state interest."

106.    As key to our showing a likelihood to prevail on the merits, we will show that this ruling in the South Carolina case, upholding application of a South Carolina's sore loser law is not relevant to our case, and in doing so, we will call attention to decisive differences that underlie our claim of likelihood to prevail.

**107.    First, it is essential to take note of exactly whose rights and what rights the Court was speaking of when it said they were only modestly burdened.**

108.    In South Carolina, the only bearer of rights involve in the judgment was the South Carolina Green Party. The Court explicitly noted that the action by the plaintiff asserted "that application of the sore loser law violated the Green Party's rights of association."

109.    The Court went out of its way to call attention to **this limited nature** of the case and of its decision, saying:

110.    "Notably, the plaintiffs do no argue the Platt's individual rights of association have been affected by the Elections Commission's application of the sore-loser statute."

111.    Accordingly, the Court made no ruling about whether the candidates individual rights were severely burdened.

112.    In the current case, the Bread and Roses party is not even a Plaintiff. Our Plaintiffs are three individuals, the candidate, Dr. Segal; Dr.Roemer, a member of the 25-person interim governing body of the Bread and Roses Party; and Mr. Hodge, an independent voter. We argue that the following rights are severely burdened:

113.    Dr. Segal's free speech rights.
114.    Dr. Segal's associational rights.
115.    Mr. Roemer's associational rights.
116.    Mr. Roemer's voting rights.
117.    Mr. Roemer's speech rights.
118.    Mr. Hodges voting rights.

119.    Virtually **none of these rights were addressed in the South Carolina case**, and this, in part, was noted by the Court in its decision.

120.    Further, even with respect to the Green Party's associational rights, the issue before the Court and the basis of the Court's ruling was very narrow: **The right of the Green Party to nominate its preferred candidate**:

"We first address whether the South Carolina sore-loser statute placed a severe burden on the Green Party's **right to choose its own candidate.**"

121.    The term "first address" did not signify that the court would then inquire about **other** associational rights beyond the "right to choose its own candidate" -- rather **this** "right to choose its own candidate" **was the associational right at question** in the South Carolina case. But associational rights go beyond the right of the party to choose its preferred candidate.

122.    In the current case, the associational rights of Segal and Roemer are quite distinct from Bread and Roses **right to name** its preferred candidate. They are the broader rights as cited by the Court as "the rights of individuals to associate for the advancement of political beliefs and ideas."

123.    In the specific instance, this involves the rights of individuals to associate for the purpose of **building** a political party that will express those political beliefs and ideas. And for the purpose of **communicating** those ideas effectively to the public.

124.    In the context of the Bread and Roses Party just being formed, the burden imposed on these rights to build a political party and to communicate to the general public are indeed severely burdened if the founder and intellectual catalyst for the associational effort is denied a place on the ballot. Whether this can be overcome by the states interest is a different issue, and one to be decided within the context of a strict scrutiny review. But that the burden levied on **these associational rights** is quite different than that on the Green Party in South Carolina is evident.

125.    Moreover, in assessing the burden on the associational rights of those seeking to build a new party, **the purpose of the association itself is central to**

**whether or not the burden is severe**. If the associational purpose is not severely hampered then the situation is quite different than when the free exercise of the right is vital to the associational purpose.

126.     Here it should be understood that the central reason for the decision by those engaged in building The Bread and Roses Party is not to have electoral victory at the polls. Rather, **it is the campaign itself.** The electoral contest is, in the eyes of the associational group, the primary free-speech arena in American society. Thus, in order to communicate to others, in order to effectively express values, beliefs and policy ideas that are outside the mainstream, and are new and complex, **for the association to be deprived of its key spokesperson is indeed a severe burden.**

127.     Going beyond associational rights, the case for severe burden to be established is even stronger.

128.     Dr. Segal's free speech rights include the right to communicate within an environment within which he may be heard. This is the electoral contest, and whether it can be justified or not, to cut him off from this arena is to severely burden his expressive rights.

129.     Further **the voting rights** involved have their own independent logic. The right for instance of Mr. Roemer to vote for the candidate of his choice, and for an individual who best expresses his beliefs and values is not only severely burdened, **it is totally unfulfilled**, when such candidates are prevented from being on the ballot.  When this occurs because of a non-tailored state statute it is impermissible.

130. .    **The Supreme Court has on various occasions emphasized the importance of such voter rights, especially with respect to candidates representing "distinct political points of view."**

131.     Thus, in Anderson v. Celebrezze 460 U.S. 780 (1983), the Supreme Court case which provided the most detailed specification of how ballot access cases are to be decided, the Court called special attention to voters' rights in adjudicating ballot access cases, making clear that a high bar would have to be met by states, and this was especially true when candidates representing distinct political points of view were involved:

> Our primary concern is with the tendency of ballot access restrictions "to limit the field of candidates from which voters might choose." Therefore, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." (internal quote from: *Bullock v. Carter*, 405 U. S. 134, 405 U. S. 143 (1972).

132.     And:

> Our primary concern is with the tendency of ballot access restrictions "to limit the field of candidates from which voters might choose." Therefore, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Ibid.*

- . . .in *NAACP v. Alabama ex rel. Patterson*, <u>357 U. S. 449</u>, <u>357 U. S. 460</u> (1958), Justice Harlan stated that it "is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."

- In our first review of Ohio's electoral scheme, *Williams v. Rhodes,* <u>393 U. S. 23</u>, <u>393 U. S. 30</u>-31 (1968), this Court explained the interwoven strands of "liberty" affected by ballot access restrictions:

- "In the present situation, the state laws place burdens on two different, although overlapping, kinds of rights -- **the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.**"

- As we have repeatedly recognized, voters can assert their preferences only through candidates or parties or both.

**133.     The Supreme Court went so far in Anderson v. Celebreeze as to lay down a criterion for determining if the right to vote is "heavily burdened":**

> "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish,* <u>415 U. S. 709</u>, <u>415 U. S. 716</u> (1974). **The right to vote is "heavily burdened" if that vote may be cast only for major party candidates at a time when other parties or other candidates are**

24

"**clamoring for a place on the ballot.**"*Ibid.; Williams v. Rhodes, supra,* at <u>393 U. S. 31</u>.

> The exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for likeminded citizens. [<u>Footnote 8</u>] Page 460 U. S. 789

134.   Going even further, in Celebreeze, the Court identified **a special burden** the State must overcome when dealing with groups with a particular viewpoint:

> As our cases have held, Page 460 U. S. 793 it is **especially difficult** for the State to justify a restriction that limits political participation **by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status.** [<u>Footnote 15</u>]

135.   And the Court emphasized the importance of Third Parties outside the mainstream:

> . It discriminates against those candidates and -- of particular importance -- against those voters whose **political preferences lie outside the existing political parties**. *Clements v. Fashing, supra,* at 457 U. S. 964-965 (plurality opinion). By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions **threaten to reduce diversity and competition in the marketplace of ideas.** Historically, political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the *status quo* have, in time, made their way into the political mainstream. *Illinois Elections Bd. v. Socialist Workers Party,* 440 U.S. at440 U. S. 186; *Sweezy v. New Hampshire,* 354 U. S. 234, 354 U. S. 250-251 (1957) (opinion of Warren, C.J.). [Footnote 17] **In short, the primary values protected by the First Amendment -- "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,"** *New York Times Co. v. Sullivan,* 376 U. S. 254, 376 U. S. 270(1964) **-- are served when election campaigns are not monopolized by the existing political parties.**

136.   **All of these important considerations pertain to the current case, and are a basis for our judgment that a strict scrutiny**

standard would be employed, and further that it could not be satisfied in the application to Dr. Segal of Maryland's "sore loser" law, as little legitimate state interest is served in keeping him off the ballot, and substantial public interest is served through his admission to the ballot.

**Plaintiffs**

1. _____     9/4/2018

Jerome Segal
7910 Takoma Ave
Silver Spring, Md. 20910

301-675-3260
Jerome@Jeromesegal.org

2. _____     9/4/2018

Peter Roemer
616 Great Falls Road
Rockville, Md. 20850
301-213-5619
Peterroemer@gmail.com

3. _____     9/4/2018

Michael Hodge
227 Cypress Creek Rd.
Severna Park, Md. 21146

301-980-3688
Mike@Bcast.com