## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JEROME SEGAL, *et al.*, | * | |
| *Plaintiffs*, | * | |
| v. | * | Civil Action No. 1:18-cv-02731-GJH |
| MARYLAND STATE BOARD OF ELECTIONS, *et al.*, | * | |
| | * | |
| *Defendants*. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR
## PRELIMINARY INJUNCTIVE RELIEF

Defendants the Maryland State Board of Elections (the "State Board") and Linda H. Lamone, in her capacity as State Administrator of Elections (together, the "State Defendants"), respectfully submit this Opposition to the request for preliminary injunctive relief set forth in the Complaint filed by plaintiffs Jerome Segal, Peter Roemer, and Michael Hodge.

The "key issue" in this case, as Plaintiffs concede, is the constitutionality of Maryland's "sore loser" law. Compl. ¶ 94. If Maryland's statutory bar against candidates who have been "defeated for the nomination for a public office" from "appearing on the ballot at the next succeeding general election," Md. Code Ann., Elec. Law § 5-706(b) (LexisNexis 2017), can constitutionally be applied to preclude Mr. Segal's nomination by *any* party (recognized or not), then the issue of whether the State Board's determination that Mr. Segal's proposed Bread and Roses Party (the "Party") failed to acquire the necessary signatures by the deadline for nominating candidates loses its urgency, if it is not

mooted altogether.  Mr. Segal was the only nominee certified by the Party for this year's general election, and therefore his ineligibility would mean that no other candidate would appear on this year's general election ballot as a nominee of that party.

Regarding that "key issue," Plaintiffs are not likely to succeed on the merits of their claim.  "Sore loser" statutes have been consistently upheld by the Fourth Circuit, and analogous statutes have been blessed by the Supreme Court.  These precedents foreclose Plaintiffs' challenge.  And because Dr. Segal is ineligible, Plaintiffs' challenge to the statutory "name standard" utilized by the State Board to verify petition signatures is moot with regard to the relief requested in the Complaint, and is not ripe otherwise.  The Party is approximately 270 signatures short of the threshold needed for the Party to obtain "status" to be able to field nominees in the next general election, and the Party has until July 9, 2020 to reach that threshold.  The Court should decline to reach the constitutional issues raised by Plaintiffs regarding the State Board's verification of submitted signatures to date, when the constitutional issues are likely to be obviated by the submission of additional signatures.

Because Plaintiffs are unlikely to succeed on the merits of their claims, and because the remaining preliminary injunction factors of irreparable harm, the balance of equities, and the public interest, weigh in favor of the defendants, the Court should deny Plaintiffs' requested preliminary injunction.

# BACKGROUND

### Relevant Legal Provisions

A candidate seeking the nomination of a party that is not required to nominate its candidates by primary election must file a "declaration of intent" by the first Monday in July (this year, July 2), and a "certificate of nomination" signed by the "officers of the political party" by the first Monday in August (this year, August 6). Elec. Law §§ 703.1(b), (c)(3)(i), (e) (2017 LexisNexis Supp.).  But if the candidate had already participated unsuccessfully in the primary election for one of the major party's nominations, then except in circumstances not applicable here, that candidate's name "may not appear on the ballot at the next succeeding general election as a candidate for any office." Elec. Law § 5-706 (2017 Lexis Nexis Supp.).

As relevant here, a party wishing to obtain legal status to be able to nominate candidates for elections to public office must file with the State Board a petition identifying the name of the party, the identity of the chairman of the party, and the identities and addresses of the 25 registered voters who will serve as the party's "initial governing body," and appending pages containing the signatures of at least 10,000 registered voters. Elec. Law §§ 4-102(a), (b).  The petition must be filed within two years of obtaining the first of the 10,000 signatures, *id.* § 4-102(b)(2)(ii), and may be filed at any time except between the first Monday in August (this year, August 6) and the eleventh day after the general election (this year, November 17), *see id.* §§ 4-102(c)(2)(ii), 3-302(a).  Registered voters signing a petition must sign their name "as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the

3

initials of any other name," and include the name in printed form as well as the individual's address and the date of signing. *Id.* §6-203(a).

The deadline for a nominee to decline the nomination was the 70th day preceding the general election (this year, August 28).  Elec. Law § 5-801(b)(2)(i) (LexisNexis 2017). If a vacancy in a nomination occurs as the result of the death or disqualification of the nominee, or the declination of the nomination, the relevant party's local or state central committee must fill the vacancy by September 7, 2018.  Elec. Law § 5-1004(b) (LexisNexis 2017) ("by the 60th day before the general election").

The State Board must certify the content and arrangement of general election ballots "*at least* 55 days before the election (this year, September 12), Elec. Law § 9-207(a)(1) (LexisNexis 2017) (emphasis added), whereupon the ballots are posted for public display, *id.* § 9-207(c).  Unless otherwise ordered by a court, after the second day of public display, the content of the ballots may not be changed and the State Board may begin to print the ballots.  *Id.* §§ 9-207(c) – (e).  The State Board must provide absentee ballots to military and overseas voters by September 22, 2018.  52 U.S.C. § 20302(a)(8)(A) ("not later than 45 days before the election").

Early voting will begin on October 25, 2018 and continue through November 1, 2018.  *See* Elec. Law § 10-301.1(d)(1).  The general election will take place on November 6, 2018.

### Factual Background

Dr. Segal unsuccessfully competed for the nomination for United States Senate in the June 26, 2018 primary election.  Compl. ¶ 6.

On July 2, 2018, Dr. Segal inquired about running as a candidate for a different political party in the general election, and State Board personnel told him that he is ineligible under Maryland law to do so  Compl. ¶ 7.  They also informed him his only means of challenging this provision was to attempt to initiate a nomination and then challenge the resulting rejection in court.  *Id.*  Later that day, Dr. Segal filed several "declarations of intent" with the State Board, but left the party affiliation in one of these "blank" in case his petition for recognition of the Party was successful.  *Id.*  The State Board promptly rejected these forms and provided copies of the file-stamped rejected forms to Dr. Segal.  *Id.*

On August 6, 2018, Dr. Segal submitted a petition signed by approximately 15,000 purported Maryland registered voters seeking the State's recognition of the Party (the "Petition").  *Id.* ¶ 8.  The Petition identified Dr. Segal as the Party's chairman and contained a list of 25 individuals to serve as the interim governing body of the Party.  *Id.*  On that same day, Dr. Segal also submitted a new declaration of intent, which reflected his intent to run for the United States Senate as a candidate of the Party, and he also submitted a "designation of candidate statement from the [Party] naming him as their candidate in the general election in November."  *Id.*[1]

The State Board accepted the petition for review and verification of the signatures that accompanied it, *see* Elec. Law §§  6-206(b)(1)6-207(a)-(b), but once again "rejected"

---

[1] The State Board does not prepare forms that match this description.  It is likely that this reference in the Complaint is to the certificate of nomination, which is filed along with the petition and contains the certification and signature of the officer(s) of the third party making the nomination.  *See* Elec. Law § 5-703.1(e).

the declarations of intent and certificates of nomination Dr. Segal had submitted.  Compl.
¶ 8.  The State Board provided Dr. Segal with copies of the file-stamped rejected forms.
*Id.*

On August 27, 2018, the State Board informed Dr. Segal that, after verifying the
signatures accompanying the petition submitted to obtain recognition of the Party, it had
concluded that the petition contained only 9,773 valid signatures—227 fewer than the
minimum number required to obtain recognition of the Party.  *Id.* ¶ __.  Approximately
1,200 signatures were rejected for not adhering to the "name standard," which requires that
petition signers sign their name 'as it appears on the statewide voter registration list or the
individual's surname of registration and at least one full given name and the initials of any
other name."  *Id.*  On September 4, 2018, Dr. Segal learned that a random sample of these
"name standard" rejections revealed that most of the rejections in the sample were due to
the absence of a middle initial

On August 29, 2018, Dr. Segal received an email from Jared DeMarinis, Director
of Candidacy and Campaign Finance at the State Board, that his "candidacy as the Bread
and Rose[s] U.S. Senate candidate for the general election" had been "rejected," due to his
unsuccessful entry in the contest for the Democratic nomination in the June 2018 primary
election, as well as the fact that the Party "failed to qualify for the 2018 general election."
*Id.* ¶ 10.

**Ballot Preparations**

The State Board certified the content and arrangement of the general election ballots
on September 7, 2018.  *See* Decl. of Natasha Walker ¶ 6 (the "Walker Decl.") (attached

hereto as Exhibit A).   Although the relevant statute did not require certification until September 12, *see* Elec. Law § 9-207(a)(1) (LexisNexis 2017) ("*at least* 55 days before the election" (emphasis added)), prompt action was necessary because of the impending September 22 deadline for providing absentee ballots to military and overseas voters as well as the testing of voting equipment in advance of early voting and election day.  Walker Decl. ¶¶ 4-5, 7-10.

After it certified ballots on September 7, 2018, the State Board placed the ballots on public display for a period of two days as required by Election Law § 9-207.  *Id.* ¶ 7.  Also on September 7, the State Board imported ballot styles into its MDVOTERS database so that local election boards could proof ballot-style-to-precinct associations.[2]  *Id.*  The State Board also provided preliminary ballot data to its web delivery system programmer for testing of web-delivered absentee ballots.[3]

On September 10, 2018, after the required two days of public display, ballot PDFs were sent to the State Board's printing vendor for the printing of early voting and general election ballots.  *Id.* ¶ 8.  On September 11, 2018, test deck ballot PDFs were provided to the printer.  *Id.*[4]  It takes approximately two days to lay out the ballot styles and create the

---

[2] This step serves as a check to make sure voters in each precinct across the State receive the correct ballot.  Walker Decl. ¶ 7.

[3] A registered voter may request an absentee ballots in person or request delivery by mail or by web delivery.  *See* Elec. Law § 9-305.

[4] Test decks are sets of pre-filled ballots used to test the vote tabulation machines, to ensure that the tabulators are properly configured to count votes for every candidate in a given contest.  Walker Decl. ¶ 5.  It takes approximately two weeks to print the test decks used to test these machines.  *Id.*  The testing process itself—known as "logic and accuracy" (or "L&A") testing—can take as long as three weeks for larger counties and testing must

metal printing plates for each ballot style.  When ballot styles change, new ballot-style PDFs must be sent to the printer, and the pre-print production process must be redone. Walker Decl. ¶ 8.

On September 11, 2018, the State Board sent ballot PDFs to the absentee printer and mailhouse.  *Id.* ¶ 9.  On September 12, 2018, the State Board assigned ballot styles to the voters who (to date) have requested an absentee ballot for the current election and provided ballot PDFs and ballot data files to the web delivery system programmer.  *Id.*  On September 13, 2018, the State Board sent absentee voter data to the absentee ballot printer and mailhouse.  *Id.*  Also on September 13, 2018, the absentee ballot printer provided electronic proofs of the ballots to the State Board for review.  The web delivery system programmer also began to test the delivery system for accuracy using the final ballot data. *Id.*  On September 17, 2018, the State Board completed its review of the electronic proofs from the absentee ballot printer.  *Id.*

Beginning on September 18, 2018, the absentee ballot printer will begin printing ballots and preparing the packets for mailing to overseas and military voters.  *Id.* ¶ 10.  The first mail delivery will take place on September 21, 2018.  *Id.*  The first web delivery will take place on September 20, 2018.[5]  *Id.*

---

be complete for the general election by October 23, 2018.  *Id.*; *see* COMAR 33.10.02.14.A(2)(a).

[5] The web delivery will be made on Thursday, September 20, to ensure that the next day is a business day, so that State Board staff is available to respond promptly to inquiries or problems regarding the web-delivered ballots.  Walker Decl. ¶ 10.

On or around October 1, 2018, printed test decks and early voting/general election ballots will arrive at local boards of election. *Id.* ¶ 11.  Local boards will begin L&A testing at that time, in order to complete L&A testing by the October 23, 2018 deadline. *Id.*

This timetable allows ballots to be ready for delivery to military and overseas voters by Friday, September 21, 2018, in compliance with the September 22 federal deadline.  It also allows for the required L&A testing to be complete by October 23, 2018, in accordance with the regulatory deadline. *Id.*

**Procedural History**

Despite the State Board's informing Dr. Segal that his candidacy was being rejected as early as July 2, 2018, Plaintiffs did not commence this lawsuit until September 5, 2018.

In their Complaint, Plaintiffs have challenged the constitutionality of the sore loser law as applied to Dr. Segal's candidacy from the perspective of the First Amendment speech, associational and/or voting rights of the individual plaintiffs. *See id.* Compl. ¶¶ 95-136.  Plaintiffs have also challenged the constitutionality of the State Board's deployment of the "name standard" set forth in Election Law § 6-203 in verifying the signatures submitted with the Petition. *See* Compl. ¶¶ 82-94.  As to both statutes, Plaintiffs contend that the burdens they impose on Plaintiffs' constitutional rights overwhelm any state interests associated with their imposition, and that therefore they are subject to—and fail—strict constitutional scrutiny.

Plaintiffs seek a preliminary (and, presumably, a permanent) injunction requiring the State Board to "reevaluate" the rejected signatures submitted along with the petition

for recognition of the Party, or, if that is not possible, to simply place Dr. Segal on the ballot in the contest for which he has sought the nomination.  Compl. 1 ("Relief Sought").

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). Plaintiffs must establish all four requirements and must make a "clear showing" that they are entitled to relief.  *Id.*

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.

### A.   Plaintiffs' Challenge to the Sore Loser Statute Is Foreclosed by Fourth Circuit Precedent.

Plaintiffs are unlikely to succeed on the merits of their challenge to the sore loser statute because the Fourth Circuit has already considered—and upheld—similar statutes against analogous constitutional challenges.

In *Backus v. Spears*, 677 F. 2d 397 (4th Cir. 1982), the Fourth Circuit considered the constitutionality of a South Carolina statutory "loyalty oath," which required candidates to pledge "that [they] would not run in the general election if defeated in the primary."  *Id.* at 398.  The lawsuit was brought by the candidate and four of the individuals who signed the petition for his general election candidacy.  *Id.*  Citing the Supreme Court's ruling in *Storer v. Brown*, 415 U.S. 724 (1974), the Fourth Circuit held that this constitutional claim was "frivolous."  *Backus*, 677 F. 2d at 399.  The Court noted that ballot access restrictions

in *Storer*—which upheld a California statute forbidding ballot position to independent candidates who *voted* in other-party primaries or who were *registered* with a political party within one year of the primary election, *see Storer*, 415 U.S. at 733 were even more restrictive than the "sore loser" law at issue in *Backus*, and thus "the South Carolina statute would even more clearly promote the legitimate state interest in the stability of its political system." *Backus*, 677 F. 2d at 400; *see Storer*, 415 U.S. at 733 (noting that the California statute was "expressive of a general state policy aimed at maintaining the integrity of the various routes to the ballot").

As the Court observed in *Backus*, "in the course of upholding California's 'disaffiliation' requirement, *Storer* approvingly discusses a California 'sore-loser' provision—a provision substantively identical to the South Carolina provision that arguably applies here—as effectuating the valid policy of avoiding intraparty disputes in the general election."  677 F. 2d at 400 (citing *Storer*, 415 U.S. at 733-35).  In sum, "*Storer* virtually commands the result that the South Carolina loyalty oath provision is a valid regulation of the State's electoral procedures." *Id.*  *Backus* (and, indirectly, *Storer*), has that same impact on the constitutional challenge in this case.   Maryland's law is functionally identical to the South Carolina statute upheld in *Backus*, as well as to the "sore loser" provisions approvingly discussed in *Storer*, and thus the same outcome must obtain here.

Plaintiffs' do not cite *Backus* at all and instead attempt to distinguish the Fourth Circuit's more recent decision in *South Carolina Green Party v. South Carolina State Election Commission*, 612 F. 3d 752 (4th Cir. 2010).  These efforts are misplaced.  In *South*

*Carolina Green Party*, the Court considered an as-applied challenge to South Carolina's sore loser law by the candidate, the Green Party, and a voting supporter of the candidate, because the "candidate successfully secured the nomination of the Green Party *before* losing his attempt to become the Democratic Party nominee."  612 F. 3d at 755.  The application of the sore loser statute to the Green Party, according to the plaintiffs in that case, "imposed a severe burden on the Green Party's association rights," because the statute's application "effectively permitted the Democratic Party primary voters to 'veto' the Green Party's preferred candidate and prevented the Green Party from nominating a substitute candidate."  *Id.*

Although the Fourth Circuit ultimately upheld the statute against the as-applied challenge in *South Carolina Green Party*, Plaintiffs here seize on the fact that the plaintiffs in *South Carolina Green Party* did "not argue that [the candidate's] individual rights of association ha[d] been affected by the Election Commission's application of the sore-loser statute."  Compl. ¶ 110 (quoting *South Carolina Green Party*, 612 F. 3d at 755); *see also* Compl. ¶¶ 107-121.  Here, by contrast, Plaintiffs claim that their *individual* associational and voting rights are impinged by Maryland's sore loser law, and thus the ruling in *South Carolina Green Party* should not bar their claims.  Compl. ¶¶ 109-119.  But in contrast to *South Carolina Green Party*, the *Backus* case *did* involve individual claims, and it concluded that the plaintiffs' constitutional challenge to South Carolina's sore loser law based on individual First Amendment rights was "frivolous" and controlled by the Supreme Court's *Storer* decision.  *Backus*, 677 F. 2d at 400.  Plaintiffs' claims here are foreclosed by binding Fourth Circuit precedent.

**B.      The Sore Loser Statute is Otherwise Constitutional.**

Even if *Storer* and *Backus* were not binding precedent as to the facts of this case, Plaintiffs' constitutional challenge to the sore loser statute would likely fail on its own accord.

All elections regulations "invariably impose some burden upon individual voters." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).   "[A]s a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some order, rather than chaos, is to accompany the democratic process."   *Storer v. Brown*, 415 U.S. at 730. Accordingly, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"   *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).   "[W]hen those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance."   *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).   "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."   *Id.* (quoting *Anderson*, 460 U.S. at 788).

The Supreme Court has held that laws having a similar effect as the Maryland sore loser statute do not place severe burdens on voters' or candidates' constitutional rights, and

therefore need only be reasonable and nondiscriminatory restrictions that serve a State's important regulatory interests.  For example, in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), the Court examined the burdens imposed by Minnesota's law prohibiting "fusion" candidacies, in which the same candidate places his or her name on the ballot as a nominee for more than one political party.  Holding that the Court of Appeals had improperly applied a strict scrutiny analysis to the anti-fusion law, the Court explained:

> Minnesota's laws do not restrict the ability of the New Party and its members to endorse, support, or vote for anyone they like. The laws do not directly limit the party's access to the ballot. They are silent on parties' internal structure, governance, and policymaking. Instead, these provisions reduce the universe of potential candidates who may appear on the ballot as the party's nominee only by ruling out those few individuals who both have already agreed to be another party's candidate and also, if forced to choose, themselves prefer that other party. They also limit, slightly, the party's ability to send a message to the voters and to its preferred candidates. We conclude that the burdens Minnesota imposes on the party's First and Fourteenth Amendment associational rights—though not trivial—are not severe.

*Timmons*, 520 U.S. at 363–64 (internal citations and quotation marks omitted).  These factors apply with equal force here.  Maryland's "sore loser" law "rul[es] out those few individuals" who sought unsuccessfully to obtain a major party's nomination at a primary election, and they "limit, slightly, the party's ability to send a message to the voters and to its preferred candidates." *Id.*  Otherwise, they "do not restrict the ability of the [Bread and Roses] Party and its members to endorse, support, or vote for anyone they like"; they "do not directly limit the party's access to the ballot," and they are "silent on parties' internal structure, governance, and policymaking." *Id.*  Accordingly, they are not subject to heightened scrutiny, but need only be reasonable and non-discriminatory in the furtherance of important government interests.

14

Maryland's sore loser statute easily satisfies this standard. Sore-loser statutes further the government's interest "in discouraging intra-party feuding and in reserving 'major struggles' for general election ballots." *South Carolina Green Party*, 612 F. 3d at 756 (citing *Storer*, 415 U.S. at 735). They also "prevent a candidate who has lost a party primary or nomination from effecting a 'splinter' of a major political party, by joining a minor party while retaining the support of the major party's voters, thereby undermining the major party in the general election." *Id.* (citing *Clingman v. Beaver*, 544 U.S. 581, 596 (2005). They also "operate[] to reduce the possibility of voter confusion that could occur when a candidate's name appears on the ballot after losing a primary race." *Id.* at 759. Finally, they "further[] the state's in terest in ensuring orderly, fair, and efficient procedures for the election of public officials.." *Id.* The statute on its face is non-discriminatory. It is constitutionally sound.[6]

---

[6] Plaintiffs' challenge to the sore loser statute is also likely barred by laches. Laches is an affirmative defense to claims for equitable relief, *see Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. Jan. 17, 2012) (applying laches to bar election-related claims brought under § 1983). To succeed on a laches defense, a defendant must prove two elements: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961).

Here, Plaintiffs' challenge to the sore loser law was ripe when the State Board rejected Dr. Segal's initial declaration of intent on July 2, 2018—the deadline for candidates seeking to pursue unaffiliated or third-party nominations to submit a declaration of intent. Alternatively, it was ripe on August 6, 2018, when Dr. Segal's updated declaration of intent—reflecting his pursuit of the nomination of the Party for the United States Senate seat at issue—was rejected once again by the State Board. It was unreasonable for Plaintiffs to wait until September 5—over two months after the claim became ripe, and on the eve of the preparation and printing of ballots to bring this action challenging the application of the sore loser statute to Dr. Segal's candidacy. *See Perry*, 471 F. App'x at 224 (candidate's waiting for over four months to challenge petition

**C.      The Court Should Decline to Consider Plaintiffs' Challenge to the Application of the Name Standard to the Petition at this time.**

**1.      Plaintiffs' Challenge to the Application of the Name Standard to the Petition is Mooted by Dr. Segal's Ineligibility to Be Placed on This Year's General Election Ballot.**

On July 2, 2018, Dr. Segal's Declaration of Intent to seek the nomination of a yet-to-be-identified third party was rejected by the State Board because of his having pursued—and lost—the Democratic nomination for the United States Senate in the primary election.  On August 6, 2018, Dr. Segal's refiled Declaration of Intent—updated to reflect that he intended to seek the nomination of the newly petitioned Bread and Roses Party—was rejected for the same reason.  No other candidate has pursued the nomination of the Party in this election cycle.  Accordingly, if Dr. Segal is ineligible to appear on the general election ballot as a third-party nominee or unaffiliated candidate because of the sore loser statute (and he is), the Party would not appear on this year's ballot, regardless of the number of signatures it submitted in connection with the Petition.  Because the relief requested by Plaintiffs is for the placement of Dr. Segal on this year's general election ballot, *see* Compl.

---

gathering requirements gave rise to laches).  In *Perry*, the Fourth Circuit observed, in language applicable to this case:

> If we were to find Movant's delay excusable, we would encourage candidates to wait until the last minute to bring constitutional challenges to state election laws. Once a candidate learned he had been denied a place on the ballot, he would take his disappointment to the courthouse and hapless state election boards would be forced to halt their scheduled election processes to wait for a ruling.  Challenges that came immediately before or immediately after the preparation and printing of ballots would be particularly disruptive and costly for state governments.

*Id.* at 225.  Plaintiffs' challenge to the sore loser law is subject to laches and thus is unlikely to succeed on the merits for that additional reason.

1 ("Relief Sought"), their challenge to the application of the "name standard" to the Petition is moot.

> **2.     Because no Eligible Candidate Has Sought the Party's Nomination for This Year's General Election, Plaintiffs' Challenge to the Application of the Name Standard to the Petition is Not Ripe.**

Because Plaintiffs' challenge to the application of the name standard is moot with regard to the placement of Dr. Segal's name on this year's general election ballot, all that remains is their general challenge to the State Board's denial of "status" to the Party on the basis of the application of the "name standard" to the Petition.  This challenge is not ripe.

"The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'"  *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006) (quoting *Rescue Army v. Municipal Ct. of L.A.*, 331 U.S. 549, 584 (1947)).  To determine whether the case is ripe, the Court "balance[s] 'the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.'"  *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002) (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998))."  "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties."  *Miller*, 462 F. 3d at 319 (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992)).  Particularly where, as here, "a case presents a constitutional question, the ripeness doctrine helps to make sure that there is a genuine constitutional issue that necessarily must be decided and, therefore, the ripeness doctrine helps to avoid premature or unnecessary constitutional adjudications."

*Arc of Va., Inc. v. Kaine*, No. CIV 3:09CV686, 2009 WL 4884533, at *4 (E.D. Va. Dec. 17, 2009).

Here, Dr. Segal submitted the Petition on August 6, 2018, because that was the deadline for seeking status to be able to nominate candidates for this year's general election. But the issue of the Party's eligibility to field a candidate for *this* year's general election is moot. And the effective deadline for the Party to meet the signature requirement and obtain status to be able to field candidates in the next general election is July 9, 2020—two years from the date of the earliest verified signature on the Petition. *See* Elec. Law § 4-102(b)(2)(ii); Bread and Roses Petitioner Signature Summary Page (attached hereto as Exhibit B). The Petition was found to contain approximately 270 fewer valid signatures than the 10,000-signature threshold for obtaining recognition by the State, and the Party may continue to submit signatures in support of the Petition beginning on November 17, 2018, *see* Elec. Law §§ 4-102(c)(2)(ii), 3-302(a).

Accordingly, the Court should decline to entertain Plaintiffs' challenge to the application of the name standard to the Petition independent of the relief sought in the Complaint, because Plaintiffs have almost two years to solicit and submit the 270 signatures that remain for the Party to obtain status, thereby potentially obviating the need for the Court to reach the constitutional questions the Plaintiffs have raised.

18

**B.** **Plaintiffs' Are Not Likely to Succeed on the Merits of Their Constitutional Challenge to the "Name Standard."**

Should the Court consider the merits of Plaintiffs' constitutional challenge to the application of the "name standard" to the Petition, it should find that Plaintiffs are not likely to succeed on the merits of their claims.

In *Kendall v. Howard County Maryland*, Civ. No. JFM-09-660, 2009 WL 3418585 (D. Md. Oct. 20, 2009), *aff'd*, *Kendall v. Balcerzak*, 650 F. 3d 515 (4th Cir. 2011), this Court considered a constitutional challenge to the requirements of Election Law § 6-203— the "name-standard" provision—in the context of a petition to referendum. The plaintiff in that case (a signatory of the petition) argued that the statute had the effect of disenfranchising the plaintiff, violated his constitutional rights under the First and Fourteenth Amendments, and was "overbroad" and imposed an "unreasonable burden" in requiring "that signatures on a referendum petition match exactly the names as written on the voter registration card." *Id.* at *2. In evaluating the challenge, the Court concluded that the requirements of Election Law § 6-203 were non-discriminatory and content neutral, and that "the validation process mandated by the statute is reasonably related to the purpose of detecting fraudulent or otherwise improper signatures." *Id.* at *6. Thus, it "imposes no 'impermissibl[e] burden' on Plaintiff's exercise of the state-created right of referendum." *Id.*; *see Doe v. Reed*, 561 U.S. 186 (2010) (Sotomayor, J., concurring) ("States enjoy 'considerable leeway' to . . . specify the requirements for obtaining ballot access (e.g., the number of signatures required, the time for submission, *and the method of verification*)" (emphasis added)).

## II.   PLAINTIFFS CANNOT SATISFY THE REMAINING PRELIMINARY INJUNCTION FACTORS.

Plaintiffs cannot satisfy the remaining preliminary injunction factors—namely, the likelihood that they will suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest.

First, Plaintiffs are not likely to suffer irreparable harm because they are not likely to succeed on the merits of their claims.  Dr. Segal is ineligible to appear on the general election ballot due to the application of a statute of the sort that have consistently held to be constitutional.  Dr. Segal's "irreparable harm" arises from the clear and constitutional application of that statute, not the absence of the entry of a preliminary injunction.

By contrast, the balance of equities and the public interest lean overwhelmingly in favor of the denial of preliminary injunctive relief.  Given the tight schedules for preparing absentee ballots for delivery to military and overseas voters by the federal deadline of September 22, 2018, and the sequence of steps relating to the preparation and printing of general election ballots and, importantly, the testing of vote tabulation machines with "test decks," any delay occasioned by the entry of the requested preliminary injunction will substantially prejudice the State Board and potentially harm the public by impacting the orderly administration of this year's election.  Moreover, the entry of the specific relief requested by Plaintiffs—placement on the ballot of Dr. Segal, despite the likelihood that Plaintiffs will not succeed on the merits of their claims—would result in the presence of a candidate ultimately deemed ineligible by the Court on the ballot, causing confusion to voters and eroding the confidence in the public of the voting process in Maryland.

**CONCLUSION**

The Plaintiffs' requested preliminary injunction should be denied.

Respectfully submitted,

/s/ Julia Doyle Bernhardt

_____
JULIA DOYLE BERNHARDT
Federal Bar No. 25300

/s/ Andrea W. Trento

_____
Andrea W. Trento
Federal Bar No. 28816
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jbernhardt@oag.state.md.us
atrento@oag.state.md.us
(410) 576-7291
(410) 576-6955 (facsimile)

September 17, 2018                    Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JEROME SEGAL, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 1:18-cv-02731-GJH |
| MARYLAND STATE BOARD OF ELECTIONS, *et al.*, | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## CERTIFICATE OF SERVICE

I certify that on this 17th day of September 2018, the foregoing Opposition to Plaintiff's Emergency Motion to Stay the State Court proceedings and the Preliminary Injunction was filed and served electronically via CM/ECF and served on all parties by email and by first class mail at the following addresses:


Jerome Segal
7910 Takoma Avenue
Silver Spring, MD 20910
jerome@jeromesegal.org

Peter Roemer
616 Great Falls Road
Rockville, MD 20850
peterroemer@gmail.com

Michael Hodge
227 Cypress Creek Road
Severna Park, MD 21146
mike@bcast.com

*Plaintiffs pro se*

/s/ Andrea W. Trento
_____
Andrea W. Trento